## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## GREENVILLE DIVISION

| | |
|---|---|
| Leon Edwards,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>James Parish, Travis Reese, O. Colbert, J.<br>Brown, Sgt. Dayshawn Johnson, M.<br>Cleveland,<br><br>　　　　　Defendants. | C/A NO.:  6:20-CV-02749-MGL-KFM<br><br><br>**DEFENDANTS' MOTION FOR**<br>**SUMMARY JUDGMENT** |

　　　NOW COME THE DEFENDANTS James Parrish, Obrian Colbert, John Brown, Dayshawn Johnson, and Micquel Cleveland (hereinafter collectively referred to as "Defendants"), by and through their undersigned counsel, who hereby move for summary judgment pursuant to Rule 56, FRCP, as to all causes of action raised in Plaintiff's pleadings for the reasons stated herein.  Defendants submit this memorandum in support of their Motion for Summary Judgment.

## **FACTUAL BACKGROUND**

　　　Plaintiff, *pro se*, is a state inmate currently incarcerated at Perry Correctional Institution after convictions in 2018 for drug offenses.  Plaintiff's projected max-out date for release from incarceration is October 1, 2023. [Exhibit One, Inmate Search Detail Report] Plaintiff brings this action against numerous individual Defendants for a violation of his constitutional rights while in confinement.

　　　In his Complaint, Plaintiff alleges numerous officers responded to the Wateree Unit for a "first response" call. [ECF No. 1, p. 9] Plaintiff claims that numerous officers came to extract him and his roommate from their locked cell.  Plaintiff was in Room 124. [Id.]

Plaintiff alleges that he and his roommate attempted to be restrained but instead Defendant Parrish sprayed chemical munitions into the room. Plaintiff was able to evade the spray but the spray hit Plaintiff's pre-packed SCDC locker bag. After about 5-7 minutes Plaintiff and his roommate were cuffed behind their backs and they attempted to get on their knees. [Id.]

According to Plaintiff, he was snatched out of the room by Defendant Cleveland and slammed on the ground. Plaintiff alleges numerous officers then punched and kicked him. [Id.] In his deposition, Plaintiff testified he does not know who was striking him other than Defendant Cleveland. [Exhibit Two, depo. of Plaintiff, p. 43-44] Plaintiff claims that four officers struck him but he does not know their names other than Defendant Cleveland. [Id.]

Plaintiff then claims that Officers Cleveland, Colbert, Brown, and Reese grabbed his extremities and carried him up the "floodzone" steps, hitting Plaintiff's head twice on the steps. [ECF No. 1, p. 10] Then the officers slammed him to the floor in front of the floodzone steps where allegedly Defendants Cleveland and Brown struck Plaintiff. [Id.] In his deposition, Plaintiff testified it is possible that someone other than Defendant Brown struck him at the top of the steps. [Ex. Two, p. 47]

The Defendants then moved Plaintiff toward the sally port and off the wing. [ECF No. 1, p. 10] While walking through the sally port door Plaintiff alleges that Defendant Brown pushed Plaintiff's head into the doorframe. [Id.] But in his deposition, Plaintiff could not confirm that Brown did this. [Ex. Two, p. 49] Plaintiff described Brown as being a black male who is a little bigger and a little shorter than Plaintiff. [Id., p. 74] Plaintiff himself is tall and thin at 6'3" and 188 pounds. [*See* Exhibit One] In reality, Brown is 6'4" tall and approximately 300 pounds. [Exhibit Three, Declaration of John Brown]

In his deposition, Plaintiff claimed that four officers escorted Plaintiff to RHU. He thought these officers were Reese, Cleveland, Colbert, and Brown. [Ex. 2, p. 70] As we now know, Reese was not working for SCDC at this time and has been dismissed from this action. [*See* ECF Nos. 31 and 94] Defendants allegedly intentionally let Plaintiff fall to the ground while escorting Plaintiff to RHU. [ECF No. 1, p. 11]

Once they arrived in RHU, Plaintiff alleges Defendant Johnson punched him in the face five times while yelling threatening comments. [Id.] Plaintiff then claims that Defendants Cleveland and Colbert kicked and stomped him and that Officers Cleveland, Brown, and Reese returned to the holding cell numerous times to assault Plaintiff. [Id., p. 11-12] In his deposition, Plaintiff testified that Defendants Cleveland, Colbert, Brown, and Reese were the ones who assaulted him in the holding cell. [Ex. Two, p. 74]

Plaintiff's Complaint only begins to tell the full story.  Plaintiff does not explain what precipitated the response by officers to the Wateree Unit in the first place. According to Plaintiff, he and his roommates had already packed their bags to be transferred to RHU because an officer had just been assaulted on the wing. [Ex. Two, p. 49-50] Plaintiff pled the Fifth Amendment when asked whether he was part of the assault on the officer. [Id., p. 50] Plaintiff did in fact admit to being convicted of a disciplinary violation for assaulting an officer on this date. [Id., p. 50-51] At the disciplinary hearing, Officer Lantigua testified that Plaintiff punched Officer Cabbagestalk in the face. [Id., p. 51-52] Plaintiff also pled the Fifth when asked if he punched Officer Cabbagestalk. [Id.] Two criminal charges are currently pending against Plaintiff pursuant to indictments for assault and battery third degree and rioting or inciting prisoners to riot by the Richland County Grand Jury on September 15, 2020. [Exhibit Four, indictments] Plaintiff's roommate, Richard Cochran, has been indicted for accessory before the act of attempted murder and rioting or inciting

prisoners to riot. [Id.] A third inmate, Marion Powell, has also been indicted for numerous charges including assault and battery of a high and aggravated nature. [Id.]

Here's the rest of the story:  Plaintiff and his roommate had been denied an opportunity to take a shower on June 28, 2019.  [Ex. Two, p. 53-54] Plaintiff tried unsuccessfully to talk Officer Cabbagestalk into letting his roommate out for a shower. [Id., p. 54-55] Plaintiff planned to stay in the room. [Id., p. 57-58] Plaintiff's roommate then started arguing and cussing with Officer Cabbagestalk. [Id., p. 55] Eventually, Officer Cabbagestalk opened the door and Plaintiff put his shoes on. [Id. p. 57-58] Cochran and Officer Cabbagestalk were talking in the doorway. Plaintiff pushed Cochran towards Officer Cabbagestalk at least three times. [Id., p. 59-60] After the third push, Cochran ducked under Officer Cabbagestalk's hand to leave the room and then Plaintiff was punched in his lips by Officer Cabbagestalk. [Id., p. 60-61] Officer Cabbagestalk never told the inmates they could leave the room. [Id., p. 61] Plaintiff then ran out of his cell and up the floodzone steps. [Id., p. 62] Plaintiff fell onto his left knee at the top of the steps where Officer Cabbagestalk caught up to him and started swinging punches. [Id., p. 62-63] Plaintiff testified that Officer Lantigua was in the dorm but he does not know where. [Id. p. 63] After dodging punches from Officer Cabbagestalk, Plaintiff ran back in his room, with Cochran a few seconds behind. [Id., p. 64-65] Plaintiff claims he does not know where Cochran was during the time Plaintiff was out of his room. [Id., p. 66-67]

SCDC Police Services and SLED responded to the institution on June 28, 2019. Police Services collected statements and prepared a report, and SLED collected forensic evidence. [Exhibit Five, Investigative Report 33-2019-077] Police Services summarized the statements and evidence it collected from inmates and officers. Officer Lantigua was also a victim of the incident. [Id., p. 1-2]  As part of the investigation, Officer Cabbagestalk identified Plaintiff as the person

that had initially assaulted him, Cochran as the person that assaulted Lantigua, and Powell as the person that stabbed him. [Id., p. 3-4] Importantly, Cochran admitted to Police Services that a fight erupted between himself, Edwards, Officer Cabbagestalk, and another officer in the floodzone. Cochran says that the other officer threw him to the floor and down the hallway. Cochran chased the officer to the broom closet. [Id., p. 5]

Officer Cabbagestalk described that he was trying to get Edwards and Cochran back in their room after he had mistakenly opened their door. [Id., p. 5-6] Plaintiff hit Cabbagestalk in the face and then the inmates ran out of the cell posturing as if to fight. Cabbagestalk and another officer had to defend themselves as they attempted to get off the wing. The other officer shouted, "He has a knife!" and he heard Cochran say, "Let's kill these motherfuckers!" Inmate Powell then emerged from another room and produced a weapon. Powell refused directives to put down the weapon and proceeded to stab Officer Cabbagestalk. [Id., p. 6]

Lantigua's account was even more harrowing. Lantigua heard Officer Cabbagestalk arguing with two inmates in the floodzone. As Lantigua saw Officer Cabbagestalk telling the inmates to get back in their room, a third inmate approached Lantigua from his right side. As Officer Cabbagestalk was trying to get the inmates back in their room, the taller inmate pushed Cabbagestalk's face. The other inmate pushed his way out of the room and Cabbagestalk attempted to defend himself by punching the taller inmate. Lantigua grabbed the inmate that had run out of the room and threw him to the ground while Cabbagestalk was struggling with two other inmates. All three inmates were trying to remove the officers' vests. One of the inmates tried to stab Lantigua and hit Lantigua with a broomstick. One of the inmates stabbed Cabbagestalk. The scene was described by Lantigua as mutual combat between Cabbagestalk and Plaintiff, with the men fist-fighting their way across the unit. Plaintiff ended up with a ripped shirt and blood on his

clothes. Lantigua attests that a photo of Plaintiff taken on the incident date accurately depicts the way Plaintiff looked after fighting with Cabbagestalk. Lantigua had to retreat and hide in a closet to escape the attackers. Lantigua was able to get himself out of the area and, with the help of Lt. Colbert, was able to get Officer Cabbagestalk off the wing. [Exhibit Six, Declaration of Richard Lantigua]

Plaintiff does not include any facts in his Complaint explaining the context leading up to the first responders being called to the Wateree dorm. Everything stated in Plaintiff's Complaint happened after the attack on Officers Cabbagestalk and Lantigua. The preceding incidents are highly relevant and probative as to the need for immediate and necessary force, and the alleged damages suffered by Plaintiff. Plaintiff cannot prove that the damages he now alleges were inflicted by the first responders were not in fact suffered when Plaintiff engaged in mutual combat with Officers Cabbagestalk and Lantigua.

All Defendants should be granted summary judgment because Plaintiff failed to exhaust his administrative remedies. Defendant Parrish should be granted summary judgment because there is no genuine issue of material fact that the reasonable amount of chemical munitions deployed, under the circumstances, constituted an excessive use of force. Next, Defendants Colbert, Brown, and Johnson should be granted summary judgment because there is no material evidence that they participated in the alleged excessive use of force. All Defendants should also be granted summary judgment because there is no genuine issue of material fact that the injuries were inflicted by any of the Defendants or first responders. The only competent evidence shows any injuries suffered by Plaintiff were a result of his attack on Officer Cabbagestalk.

## STANDARD OF REVIEW

Fed. R. Civ. P. 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As a practical matter, this standard means that a Plaintiff "must produce sufficient evidence to reasonably support a jury verdict in its favor." *Grooms v. Mobay Chem. Corp.*, 861 F. Supp. 497, 501 (D.S.C. 1991), *aff'd* 993 F.2d 1537 (table) (4th Cir. 1993), cert. denied, 510 U.S. 996 (1993). Thus, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## LAW/ANALYSIS

**I.      Defendants are entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies prior to filing suit in this matter.**

"No action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The term "prison conditions" means all prison life, whether general circumstances or particular episodes and irrespective of the type of wrong alleged. *Porter v. Nussle*, 534 U.S. 516 (2002).

Exhaustion is mandatory prior to bringing suit under § 1983. *Id.* "[T]he PLRA's exhaustion requirement is mandatory," *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 677 (4th Cir. 2005), and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532. The Supreme Court noted a district court has no discretion to determine whether

7

administrative remedies need to be exhausted in a particular case. The Court stated that "[e]ven when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Id.* at 524.

In addition, in *Woodford v. Ngo,* 548 U.S. 81 (2006), the Supreme Court held that the PLRA exhaustion requirement requires "proper exhaustion" prior to filing suit. The Supreme Court stated that "[a]dministrative law requires proper exhaustion of administrative remedies which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." 548 U.S. at 90. Failure to exhaust all levels of administrative review is not "proper exhaustion" and will bar actions filed by inmates under any federal law. *Id.* "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of the proceedings." *Id.* at 90-91. As a result, this Court has held that "before a prisoner may proceed with his claims in a federal court, he must first properly exhaust his administrative remedies available through the SCDC grievance policy/process." *Malik v. Ward,* 2010 WL 936777, *2 (D.S.C. 2010).

In *Moore v. Bennette*, 517 F.3d 717 (4th Cir. 2008), the Fourth Circuit explained that "[u]nder the [PLRA], prisoners must exhaust 'such administrative remedies as are available' *prior to filing suit in federal court* challenging prison conditions." 517 F.3d at 725 (emphasis added) (quoting 42 U.S.C. § 1997e(a)). The reason administrative remedies must be exhausted prior to the filing of a civil action, as opposed to after or contemporaneous therewith, was explained by the Supreme Court in *Porter*, in which the Court stated:

> Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.

8

> In some instances, corrective action taken in response to an inmate's
> grievance might improve prison administration and satisfy the inmate,
> thereby obviating the need for litigation. In other instances, the internal
> review might filter out some frivolous claims. And for cases
> ultimately brought to court, adjudication could be facilitated by an
> administrative record that clarifies the contours of the controversy.

*Porter*, 534 U.S. at 524–25.  Moreover, a prisoner may not comply with the mandatory exhaustion

requirements by exhausting his remedies during the course of litigation.  *Wade v. Thomas*, 2012 WL

7678143 (D.S.C. 2012), Report and Recommendation adopted by 2013 WL 876829 (D.S.C. 2013);

*Cambron v. Harris*, 2012 WL 1579580, at *3 (D.S.C. 2012), Report and Recommendation adopted by

2012 WL 1579497 (D.S.C. 2012).

The two issues raised by Plaintiff in this lawsuit consist of deliberate indifference to medical

needs and excessive use of force. However, Plaintiff did not receive a final agency decision concerning

these issues prior to filing this lawsuit.  Therefore, this lawsuit should be dismissed.

In his Complaint, Plaintiff states he filed grievances at Kirkland Correctional Institution

and at Perry Correctional Institution. [ECF No. 1, p. 16] He claims he never received a disposition

of the grievance filed at Kirkland. [Id.] Plaintiff further claims that he filed a grievance(s)

concerning the use of excessive force and deliberate indifference to medical needs. [Id.] He states

that both grievances were denied, that he appealed both decisions, and both appeals were denied.

[Id.]

In his deposition, Plaintiff clarified that he filed two separate grievances while later housed

at Perry. [Ex. Two, p. 102] Plaintiff attached the two grievances as exhibits to his Complaint. [Ex.

Two, p. 102; ECF No. 1-10 and 1-11] Plaintiff asserts that both of these grievances were denied.

[103] Plaintiff testified that he appealed these denials by "fil[ing] another grievance, trying to

appeal those decisions, because my grievance was turned down." [Ex. Two, p. 103] In other words,

Plaintiff filed a third grievance. [Id.] The third grievance was also attached to the Complaint. [Ex.

2, p. 103; ECF No. 1-12] The third grievance was filed on a Step 1 form and was "turned down." [Ex. 2, p. 103]

In his deposition Plaintiff acknowledged that the Step 1 grievance (the third grievance) he filed on April 30, 2020, was meant to be an appeal of the excessive force grievance. [Id., p. 105] Plaintiff did not file any appeal of the denial of the grievance pertaining to deliberate indifference to his medical needs. [Id.]  Plaintiff did not file a step 2 form for either of the grievances. [Id., p. 107]

Sherman Anderson, the Branch Chief of SCDC's Inmate Grievance Branch, explains the grievance process and Plaintiff's unsuccessful attempt to complete the grievance process in the Declaration attached to this motion. [Exhibit Seven, Declaration of Sherman Anderson]

As explained by Mr. Anderson, Plaintiff did not file a Step 2 grievance concerning any of the issues raised in this lawsuit, and Plaintiff did not file an appeal from any of the returned grievances. Plaintiff could have appealed the returned grievances to the Branch Chief but Plaintiff did not take advantage of the steps available to perfect his grievances. [Exhibit Seven, ¶¶ 30-34]

Because Plaintiff did not take advantage of all of the steps available to him prior to filing this lawsuit, Plaintiff never received a final agency decision concerning any of the issues.  [Id.] A final agency decision would be stated in SCDC's response to a Step 2 grievance. [Id., ¶ 15] However, as explained by Mr. Anderson, Plaintiff never attempted to reach this stage of the SCDC grievance process.

Specifically, Plaintiff waited almost a year to file a grievance concerning the alleged events of June 28, 2019. He first filed a Step 1 grievance on March 16, 2020, concerning the alleged deliberate indifference to his medical needs. [Id., ¶ 19] This grievance was returned and processed because Plaintiff had exceeded the time frame for filing a grievance on this issue. [Id., ¶ 21]

However, Plaintiff did nothing. [Id., ¶ 23] He could have filed an appeal with the Branch Chief. [Id., ¶ 22]

Plaintiff waited even longer to file a grievance concerning the alleged excessive use of force. He did so in a Step 1 grievance filed on April 8, 2020. [Id., ¶ 24] The Inmate Grievance Coordinator at Perry returned this grievance to Plaintiff because it appeared to be duplicate to the Step 1 grievance filed about a month earlier by Plaintiff. [Id., ¶ 25] In response, Plaintiff filed another Step 1 grievance, arguing that the grievance was not a duplicate. [Id., ¶ 26] This grievance was also returned to Plaintiff because it is against SCDC policy to file a grievance concerning the disposition of another grievance. [Id., ¶ 28]

However, as explained by Mr. Anderson, Plaintiff still had options available to him at this point that he did not take advantage of. When Plaintiff received any of the returned grievances he could have filed an appeal to the Branch Chief on an RTSM form. [Id., ¶ 16, 30] *See Williams v. Reynolds*, 2013 WL 4522574 at *4 (D.S.C. 2013) ("Nevertheless, even if Plaintiff did file a Step 1 grievance that was returned unprocessed, there is no evidence that Plaintiff filed a Step 2 grievance or otherwise appealed the decision not to process the Step 1 grievance.").

As made clear by Mr. Anderson, Plaintiff did not comply with the SCDC grievance policy and Plaintiff has not received a final agency decision concerning the issues raised in this lawsuit. Plaintiff did not appeal the returned Step 1 grievances, and he did not file a Step 2 grievance, concerning any of the issues raised. Therefore, Plaintiff has failed to exhaust his administrative remedies prior to filing his Complaint.

**II.    Defendant Parrish is entitled to summary judgment because there is no genuine issue of material fact concerning excessive use of force.**

Plaintiff alleges Major Parrish deployed chemical munitions unnecessarily. However, in context, chemical munitions were necessarily and reasonably applied in this situation.

As explained in his Declaration, Major Parrish responded to the Wateree Unit upon a report of an officer being stabbed.  When Parrish responded to the unit, numerous inmates were still out of their cells. Parrish was immediately directed to Room 124 as being occupied by the inmate assailants. [Exhibit Eleven, Parrish Declaration]

The inmates in Room 124 did not comply with Parrish's clear directives to come to the door to be restrained so they could be quickly removed from the room.  Any delay might have allowed the inmates to barricade themselves in the room and turn into a standoff.  Thus, Parrish immediately deployed chemical munitions to gain the inmates' compliance. Parrish did not strike the inmates directly with the chemical munitions. Parrish used 32 total grams of chemical munitions in an attempt to control the inmates' disruptive behavior.

Plaintiff confirmed that he dodged out of the way of Parrish's spraying of chemical munitions.  The chemical munitions went on the floor and onto Plaintiff's packed bag. [Ex. Two, p. 41] Parrish never put his hands on Plaintiff in any manner. [Id., p. 43]

The Eighth Amendment prohibits cruel and unusual punishment upon persons convicted of crimes. *Shakka v. Smith*, 71 F.3d 162, 165 (4th Cir. 1995). Cruel and unusual punishment is established by showing unnecessary and wanton infliction of pain. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). This would include actions that are "totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). When prison officials are confronted with a disturbance, they must balance the threat unrest poses to others against the harm inmates may suffer if guards use force.  *Hudson*, 503 U.S. at 6.  Such decisions by guards are usually made in haste and under pressure.  *Id.* In a case such as this, where officials are accused of using excessive force in violation

of the Eighth Amendment, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 6-7.

Analysis of an Eighth Amendment claim requires inquiry into both a subjective and an objective component. The subjective component requires an analysis of whether the prison official acted with a sufficiently culpable state of mind, and the objective component requires an analysis of whether the deprivation suffered or injury inflicted was sufficiently serious. *Williams v. Benjamin*, 77 F.3d 756 (4th Cir. 1996). On the subjective side, in order to make out an Eighth Amendment violation, Plaintiff "must demonstrate that officials applied force 'maliciously and sadistically for the very purpose of causing harm.'" *Id.*, 77 F.3d at 761, *quoting Whitley v. Albers*, 475 U.S. 312, 320-21 (1986). This is a high standard to meet, because "[o]fficials are entitled to use appropriate force to quell prison disturbances[, and b]ecause officials must act 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Id.*, *quoting Whitley*, 475 U.S. at 320. On the objective side of the analysis, an inmate alleging an excessive use of force must show proof of more than *de minimis* pain or injury. *Id.* An inmate must satisfy the objective requirement that the officer's actions under the circumstances were "objectively harmful enough" to offend "contemporary standards of decency." *Hudson*, 503 U.S. at 8.

It is undisputed that Parrish used only 32 grams of chemical munitions, that did not strike Plaintiff, in his attempt to immediately deal with the imminent threat and incident in the Wateree Unit. [Exhibit Eleven, Parrish Declaration]

"It is well-settled that prison officials may use mace to compel the obedience of a recalcitrant inmate; provided that the quantity used is commensurate with the gravity of the

situation, 'gassing is not violative of constitutional rights.'" *Latimer v. Byers*, 2012 WL 3682893, at *3 (D.S.C. 2012), quoting *Bailey v. Turner,* 736 F.2d 963, 969 (4th Cir.1984).

Officer Colbert confirms that Plaintiff and his roommate refused directives to come to the door of their room to be restrained, and the officers needed to act quickly to preserve evidence and prevent the inmates from armoring themselves and barricading themselves in the room. [Exhibit Eight, Colbert Declaration, ¶ 9, 10]

The amount of force used by Parrish – 32 grams – is commensurate with the need for force, and does not constitute excessive force. Other courts have found much larger amounts of chemical munitions do not amount to excessive force. *See, e.g., Green v. Williams*, 2014 WL 6666638 (D. S.C. 2014) (granting summary judgment on an excessive force claim where 248 grams of chemical munitions was used); *Briggs v. S.C. Dep't of Corrections*, 2014 WL 1278173 (D. S.C. 2014) (dismissing excessive force claim after use of 140 grams of chemical munitions); *Kemp v. Drago*, 2013 WL 4874972 (D. S.C. 2013) (granting summary judgment on excessive force claim based on use of 72 grams of chemical munitions).

There is no evidence that Parrish wantonly punished Plaintiff or succeeded in doing so. There is no evidence Plaintiff suffered anything more than a *de minimis* injury, if any, as a result of Parrish's actions in deploying chemical munitions. Plaintiff was not directly sprayed and was removed from the room after about five minutes. *See White v. Gregory*, 1 F.3d 267 (4th Cir. 1993) (stating an inmate must suffer a serious or significant physical or mental injury in order to be subjected to cruel and unusual punishment within the meaning of the Eighth Amendment); *Jackson v. Morgan*, 19 Fed.Appx. 97 (4th Cir. 2001) (stating that recovery is proscribed if based on *de minimis* force, unless that force is repugnant to the conscience of mankind).

Defendant Parrish is also entitled to qualified immunity concerning the claim for excessive use of force.

Government officials performing discretionary functions generally are shielded from liability for civil damages so long as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223 (2009). In addressing qualified immunity, "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603 (1999). If the court finds that no right has been violated, the inquiry can end there without determining whether the right was clearly established. *Porterfield v. Lott*, 156 F.3d 563 (4th Cir. 1998).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 665 (2012)). As the Supreme Court instructed in *Mullenix*, courts should not define clearly established rights at a high level of generality, but rather, the inquiry should be undertaken in light of the specific context of the case. *Mullenix*, 136 S.Ct. at 308. "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Id.* (quoting *Aschcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Thus, the correct inquiry is to determine whether it was clearly established that the Constitution prohibited the official's conduct in the particular situation confronted by officer. *Id.* at 309. An official should be denied qualified immunity only if existing precedent makes the conclusion beyond debate that an official acted unreasonably in the particular circumstances confronted by the official. *Id.*

"[T]he manner in which [a particular] right applies to the actions of the official must also be apparent." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.*

As attested to by Major Parrish, he was faced with an extremely chaotic scene in the Wateree Unit following the stabbing of another officer. [Ex. Eleven, ¶ 5] The threat of violence was real, and the unit needed to be immediately secured, and evidence needed to be preserved if possible. [Id.] Parrish learned that the inmates involved in the attack on Officer Cabbagestalk were located in Room 124. [Id., ¶ 8] The inmates in Room 124 were given clear and understandable directives to come to the door to be restrained but they did not comply and they started armoring themselves to protect against the effects of chemical munitions. [Id., ¶ 10, 11] Therefore, Parrish believed it was necessary to use chemical munitions to gain the inmates' compliance and to prevent them from barricading themselves in the room and procuring weapons. [Id., ¶ 12, 13] Parrish deployed only 32 total grams of chemical munitions in his attempt to control the inmates' disruptive behavior and to quell the immediate and imminent threat from the inmates. [Id., ¶ 18] Parrish did not use any other force towards Plaintiff. Parrish did not touch Plaintiff. [Id., ¶ 19]

It would not have been evident to Parrish, or to any reasonable officer, that the reasonable use of chemical munitions under these particular circumstances would have violated any constitutional right. There is no clearly established constitutional right for an inmate to be free from the reasonable use of chemical munitions under these circumstances. It is not beyond debate that Parrish acted unreasonably in deciding to deploy chemical munitions. *See Mullenix*, *supra* (stating a constitutional right is clearly established only where it is beyond debate that an official acted unreasonably); *Miller v. Prince George's County*, 475 F.3d 621 (4th Cir. 2007) (stating there

can be a denial of qualified immunity only where an official has fair warning that his alleged conduct was unconstitutional).

**III.    There is no evidence Defendants Colbert, Brown, or Johnson had any personal involvement with the alleged excessive use of force.**

In his Complaint, Plaintiff very generally alleged that multiple officers were involved in subjecting Plaintiff to excessive use of force after Plaintiff was removed from his cell in the Wateree Unit.  However, upon questioning, Plaintiff could not identify the officers who were allegedly involved and indicated that he named them in the Complaint only because the officers had completed incident reports showing they had been in the Wateree Unit. There are no incident reports that report that any force was used other than the deployment of chemical munitions.

Plaintiff knows only Defendants Parrish, Cleveland, and Johnson by face. [Ex. Two, p. 30-31] He obtained the identities of other Defendants only through talking to other inmates and from incident reports. [Id., p. 31]

According to Plaintiff, the main alleged culprits in his beatings were Defendants Cleveland, Colbert, Johnson, Brown and Reese. But, to demonstrate the faulty nature of the information relied on by Plaintiff, he named as a Defendant an officer (Reese) that was no longer working at SCDC and has now been dismissed from this suit. [ECF No. 31]

Plaintiff claims he was snatched out of his cell by Cleveland, thrown to the floor, and then punched and kicked.  However, Plaintiff only assumes that it was Cleveland, and he was unable to identify any of the other officers who allegedly participated in the attack. [Ex. Two, p. 43-44.]

Other than Cleveland, Plaintiff does not know the names of the officers who carried him out of the floodzone. [Id., p. 46-47] After getting to the top of the floodzone steps, someone kicked

Plaintiff twice in his ribs but Plaintiff was unable to pinpoint who this would have been. [Id., p. 47]

After this, Cleveland and one other officer picked Plaintiff off the ground and escorted him off the unit. [Id., p. 48-49] Plaintiff was unable to identify the second officer. [Id.] Plaintiff named Defendant Brown in his Complaint as the person who pushed his head into a doorframe at this time, but during his deposition Plaintiff was not able to confirm this identification. [Id., p. 49]

Plaintiff is patently incorrect about the officers who were allegedly involved. Plaintiff has not pointed to any concrete, specific evidence that would reasonably lead one to believe Colbert, Brown, or Johnson had any involvement whatsoever. Plaintiff relies simply on the word of other inmates and incident reports, but the incident reports do not support the Plaintiff's allegations. [See Exhibit Ten, incident reports from Parrish, Cleveland, Colbert, and Brown]

But let's also look at the physical descriptions of the Defendants. Plaintiff described Colbert as being "tall, thin, and real dark." [Ex. Two, p. 73] In reality, Colbert is 6'2" tall, and weighs 270 pounds. [Exhibit Eight, Colbert Declaration] Plaintiff described Johnson as being about 5'9" or 5'10" or shorter. [Ex. Two, p. 74] Johnson is in fact 6'0" tall. [Exhibit Nine, Johnson Declaration] Finally, Plaintiff described Brown as being bigger and shorter than Plaintiff.[1] [Ex. Two, p. 74] However, Brown is 6'4" tall, weighs 300 pounds, and is known as "Big Brown." [Exhibit Three, Brown Declaration] If any officers used excessive force against Plaintiff, which is denied, it was not Colbert, Brown, or Johnson.

It is also important to note that Defendant Brown was assigned as a yard officer on the day of the incident. He was in charge of a set of keys in order to allow movement to others around the institution. He responded to Wateree and helped to lock the unit down but then he returned to his

---

[1] Plaintiff is 6'3" tall and 200 pounds. [See Ex. One]

post where he needed to be with keys for the institution. Brown did not assist with removing any inmates from their rooms. [Ex. Three, Decl. of John Brown] This is confirmed by Defendant Colbert who attests that he went to the Plaintiff's room with Major Parrish and Lt. Williams. Defendant Colbert does not even know John Brown. [Ex. Eight, ¶ 20]

All of the Defendants deny using any excessive force or seeing any excessive force used by any officers. As already explained, the only force used by Parrish was the deployment of chemical munitions. This force was justified and reasonable. Officer Cleveland assisted with restraining the Plaintiff and his inmate. Cleveland observed blood inside the inmates' cell and he saw that one of the inmates already had a bloody, ripped shirt. [Ex. Twelve, ¶ 15] Cleveland did not escort the inmates to RHU and did not observe any excessive use of force. [Id., ¶ 17, 18] Officer Johnson responded to the Wateree Unit but he did not assist with removing any inmates from their cells. [Ex. Nine, ¶ 7] Johnson observed blood on the floor of the unit, and he saw that one of the inmates being escorted to RHU was roughed up. [Id., ¶ 10] SLED agents arrived to RHU as soon as the inmates had been escorted to RHU, and Johnson did not have any further involvement. [Id., ¶ 20] Lieutenant Colbert responded to the Wateree Unit and first assisted with taking Officer Cabbagestalk to medical. [Ex. Eight, ¶ 5, 6] According to Colbert, the scene in the unit was very chaotic and they had to act quickly to remove suspects from their rooms. [Id., ¶ 9] Colbert handcuffed a short inmate and escorted him to RHU. This was the end of Colbert's involvement. [Id., ¶ 15, 17, 18]

It is clear that Plaintiff has attempted to take advantage of a situation where he was involved in an attack on Officer Cabbagestalk. Plaintiff has leveraged that situation, and the injuries he received in that incident, into a lawsuit where he now frivolously and randomly names officers as Defendants based on nothing more than the fact that they might have been present in the Wateree

Unit at some point during the aftermath of the Cabbagestalk incident. Plaintiff's failure to identify the officers involved in the alleged attack is fatal to his claim for an Eighth Amendment violation. There is no genuine issue that any of these Defendants were involved in the excessive use of force against Plaintiff, and if some officers were, which is denied, Plaintiff has failed to identify the proper Defendants.

**IV.     There is no genuine issue of material fact that Plaintiff was exposed to an excessive use of force by any of the Defendants in this matter.**

As described herein already, Plaintiff was involved in a horrendous attack upon Officer Cabbagestalk.  It is conclusively established for purposes of this lawsuit that Plaintiff attacked Cabbagestalk.[2]

Plaintiff bit off more than he could chew with Cabbagestalk.  As described by Officer Lantigua, Plaintiff and Cabbagestalk engaged in mutual combat and fought their way across the unit. They were throwing blows and punching each other. Plaintiff's shirt was ripped, and he had blood on his clothes after the fight. There was blood on the floor of the unit from one side to another. [Exhibit Eleven, Parrish decl.]

Upon going to Plaintiff's cell to remove him after Cabbagestalk had been attacked, Defendants Parrish and Cleveland both confirm that Plaintiff already appeared to be injured in his cell. [Ex. Eleven, ¶ 23; Exhibit Twelve, ¶ 16] This coincides with the account from Officer

---

[2] As a result of attacking Cabbagestalk, Plaintiff was convicted, after a hearing, of violating policy 801 (assault & battery of an employee with intent to kill).  (Ex. Two, p. 50).  Plaintiff did not seek any review of this conviction.  Plaintiff was afforded all the due process requirements enumerated in *Wolff v. McDonnell*, 418 U.S. 539 (1974), and he was afforded the opportunity to present evidence to litigate the issue of fact regarding the disciplinary violation.  Accordingly, Plaintiff would be barred from attempting to re-litigate the un-appealed and un-reviewed findings of the agency hearing officer that found that Plaintiff had assaulted Cabbagestalk, *Allen v. McCurry*, 449 U.S. 90 (1980), and this fact is established for purposes of this motion and this litigation.

Lantigua that Plaintiff and Officer Cabbagestalk had been in mutual combat across the unit. Cleveland recalls seeing blood in the cell and that Plaintiff's shirt was ripped and bloody. [Ex. Twelve, ¶ 15] Likewise, Defendant Johnson recalls that one of the inmates brought to RHU on the day of the incident looked kind of "roughed up" and his shirt had been ripped. [Ex. Nine, ¶ 10, 11] Johnson had reported to the Wateree Unit but did not take part in removing any inmates from their cells. [Id., ¶ 7]

There is no evidence, other than Plaintiff's self-serving allegations, that he suffered any injuries at the hands of any of the Defendants. The only reasonable evidence is that Plaintiff was bloodied in his fight with Officer Cabbagestalk but now Plaintiff has attempted to leverage those injuries into a claim against officers who simply responded to the unit to assist.

## V.    There is no genuine issue of material fact concerning the Defendants' liability for the alleged deliberate indifference to medical needs.

Plaintiff also alleges that Defendants Parrish, Colbert, Brown, Johnson, and Cleveland were deliberately indifferent to his serious medical needs. In support, Plaintiff alleges that after the beatings were over, and while he was being supervised by a SLED agent, he requested medical attention from the SLED agent. The SLED agent said, "We're going to handle all that." However, Plaintiff claims that he was not seen by a nurse while at Broad River. A few hours later Plaintiff was transferred by van to Kirkland supermax. After being transported to Kirkland Plaintiff was seen by a nurse.

Plaintiff never asked the Defendants for medical attention. In his deposition, he testified that he first asked Officer Collins for medical attention and then he asked the SLED agents for medical attention. [Ex. Two, p. 96-97] Plaintiff confirms that he never asked any of the Defendants

for medical attention. [Id., p. 97] Plaintiff claims the Defendants should have obtained medical attention for him based on the way he looked. [Id.]

Plaintiff also acknowledged that he received medical attention about three or four hours later upon being transported to Kirkland on the same day. [Id., p. 80-81; 97] He was seen at Kirkland for the same symptoms he was dealing with while being held in the RHU at Broad River. [Id., p. 97] Plaintiff could not explain how the delay of medical attention affected him in any way. [Id., p. 98] He simply claims that he should have been seen earlier. [Id., p. 98] Since this day, Plaintiff has had access to sick call and medical attention. [Id., p. 97]

These allegations do not state a claim for deliberate indifference to medical needs. Plaintiff's treatment did not rise to the level of deliberate indifference.

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment and states a cause of action under § 1983 because deliberate indifference constitutes "the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). Deliberate indifference exists when prison officials know of a substantial risk to a prisoner's health or safety and consciously disregard that risk. *Farmer v. Brennan*, 511 U.S. 825 (1994). The inmate's "treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" to violate an inmate's constitutional rights. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).

In the context of inmate medical care, the Constitution requires only that inmates receive adequate medical care; an inmate is not guaranteed his choice of treatment. The fact that an inmate believed he had a more serious condition or that he required better treatment does not establish a constitutional violation. *Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975).

Here, there is no material evidence that Defendants consciously disregarded any serious risk to Plaintiff's medical needs. Assuming any of the Defendants escorted Plaintiff to RHU, the Defendants' involvement ended at that time. Plaintiff never asked the Defendants for medical care and Plaintiff was under the supervision of another unit and officers. There is no evidence that any of the Defendants prevented Plaintiff from being able to receive medical care any earlier than upon being transported to Kirkland.

More importantly, Plaintiff was seen on the same day, within a matter of hours, by a nurse. [Ex. Two, p. 111 – 112] This treatment was not so grossly incompetent or inadequate to shock the conscience. Even assuming the Defendants ignored Plaintiff's condition or prevented him from obtaining medical attention at Broad River, the subsequent treatment received at Kirkland removes any claim of deliberate indifference. There is also no evidence that Plaintiff had a serious condition that required more urgent medical attention.

For these reasons, the Defendants should be granted summary judgment on Plaintiff's claim for deliberate indifference to serious medical needs.

## **CONCLUSION**

For all of the reasons stated herein, Defendants respectfully request that the Court grant their motion for summary judgment and dismiss all claims asserted against all Defendants.

**Respectfully submitted,**

**RILEY POPE & LANEY, LLC**

*s/Peter M. Balthazor*
Peter M. Balthazor, Fed ID No. 9236
Post Office Box 11412
Columbia, South Carolina 29211
Telephone (803) 799-9993
Facsimile (803) 239-1414
peteb@rplfirm.com
*Attorneys for Defendants*

23

August 3, 2021
Columbia, South Carolina